IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA     *

                                     *

v.                                        *

                                     *      CRIMINAL NO. 1:15CR65LG-RHW

MIKAL C. WATTS, et al.         *

**DEFENDANT MIKAL C. WATTS'**
**AMENDED MOTION FOR JUDGMENT OF ACQUITTAL**

Comes now, Defendant Mikal C. Watts ("Watts"), and moves for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 as to counts 1-15, 17-25, 27-28, 31-35, 37-49, 53, 55, and 74-77, 79-89, 91-95, and in support thereof would respectfully show the Court as follows:

**INTRODUCTION**

This case involves 66 active counts:

Count 1 – Conspiracy

Counts 2-15 – Mail Fraud

Counts 17-21 – Wire Fraud

Counts 22-25, 27-28, 31-35, 37-49, 53, 55 – Identity Theft

Counts 74-77, 79-89, 91-95 – Aggravated Identity Theft

Throughout its case, the Government has failed to present evidence of use of mail or wires "for the purpose of executing" the alleged scheme to defraud.[1]  There is no evidence (let

---

[1] Notably, even after the defense has rested, the Government's precise theory of what the exact scheme to defraud actually is and who, if anyone, is the alleged victim of the fraud. By contrast, the defense has conclusively proven Watts was the victim of fraud of other defendants or their independent contractor field workers.

alone evidence from which a reasonable juror could find anything but reasonable doubt) that the letters informing individuals of true claims deadlines and statute of limitations helped to execute fraud. The letters written here can only expose and not further fraud.

Count 17 alleges wire fraud in sending an email to Chris Deleon, which includes no text and only an enclosure. Deleon testified that he did not open or read the attachment.  The unread attachment consisted of state maps and innocuous identifiers of the phase II packets which were shipped by u-haul truck for phase II due diligence. Phase II due diligence includes the Feinberg-Cracken agreed plan to obtain ten complete claim packets for analysis by Feinberg, so Feinberg could determine a claim proof protocol.  There is no evidence (let alone evidence a reasonable juror could believe beyond a reasonable doubt) that an unread email was "for the purpose of executing" a scheme to defraud, and particularly not when phase II was a process requested by the claims administrator Feinberg, and not when the claims before Feinberg were placed on hold and permanently locked in a closet.

The four remaining counts of wire fraud were two pairs of wires of the same funds, and the undisputed evidence shows the funds were sent for the purpose of performing the Feinberg-Cracken Phase II due diligence project. Again, there is no evidence the funds were sent "for the purpose of execution" of a fraud. Count 21 alleges a December 6, 2010 wire of $748,973, and there is no evidence of any such wire.

Because acquittal should be granted on all counts of mail and wire fraud, the identity and aggravated identity theft fail for "legal impossibility" as Watts could not have the intent to commit mail or wire fraud as alleged, because the conduct which occurred (or was attempted) was not a crime. Counts 22-25, 27-28, 31-35, 37-49, 53, 55, are all plaintiff profile forms in which only four-digit social security numbers were used, and thus there is no identity theft and,

alternatively, the proof fails to meet the indictment, which alleges the entire social security number was used. The remaining counts (49, 53, 55, 74-77, 79-89, 91-95) are all presentment forms, which include a reversal of the first and last name of the alleged victim.   The alleged victim's name was not used in these presentment forms as alleged in the Indictment. Further, identity and aggravated identity theft have the same elements (even if worded slightly differently).[2] Thus, the remaining counts require proof the identity use was "during and in relation to" the above failed counts of mail and wire fraud. All January 16, 2013 presentments occurred over 2 years after the alleged mail and wire fraud was complete and, as a matter of law, cannot be identity use "during" the already complete mail or wire fraud. It also involved different people so cannot be "in relation to".

## LEGAL STANDARD

This Court's hands are not tied. The application of the Fifth Circuit's reasonable juror standard demands acquittal in this case for the Watts defendants. In United States v. Frye, 489 F.3d 201, 207 (5th Cir. 2007), the Court stated the standard of review for a Rule 29 motion: to review the evidence presented against the defendant in the light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Id. at 207. No reasonable juror could conclude that status letters, advising of accurate statute of limitations, were mailed for the purpose of executing fraud. No reasonable juror could conclude that an unread email attachment was for the purpose of wire fraud (Count 17). In light of the evidence presented by the defense, no reasonable juror could conclude that four wires of money sent for the purpose of executing phase II due diligence was for the purpose of executing fraud. Because the wire fraud and mail fraud counts fail, no

---

[2] *United States v. Bonilla*, 579 F.3d 1233, 1239 (11th Cir. 2009)

reasonable juror could believe that there was any intent to commit those acts.   Therefore, all identity and aggravated identity theft counts fail. No reasonable juror could find either a lack of good faith or a specific intent to commit fraud so Count 1 fails.

"The test for the sufficiency of the evidence is whether, in the light most favorable to the government, *a reasonable man might find the evidence inconsistent with every reasonable hypothesis of innocence.*"[3]   While the court must consider the evidence in the light most favorable to the government, it must grant a judgment of acquittal if the evidence provides "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."[4]

## ARGUMENT

### I.    MAIL FRAUD – COUNTS 2-15

Mail fraud requires *intent* to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises by use of the Postal Service or another private or commercial interstate carrier.[5]

Counts 2-15 of the Indictment in this case allege that Defendants:

> "*intentionally* devised and carried out . . . a scheme to defraud Victims 1-41, the Gulf Coast Claims Facility ("GCCF"), BP, and others to obtain money and property by means of materially false and fraudulent representations, pretenses and promises, and in furtherance thereof, did use and cause to be used the U.S. Mails for the purpose of executing the scheme . . . ."

Indictment (Doc. 3), p. 46, ¶2 (emphasis added).   Counts 2-15 should be dismissed as the

---

[3] *United States v. Navar*, 611 F.2d 1156, 1158-59 (5th Cir. 1980) (citing *United States v. Wilkinson*, 601 F.2d 791 (5th Cir. 1979)) (emphasis added).
[4] *See United States v. Hernandez-Bautista*, 293 F.3d 845, 853 (5th Cir. 2002) (affirming grant of judgment of acquittal).
[5] *See* 18 U.S.C. § 1341 (emphasis added).

Government has failed to introduce evidence sufficient to reasonably support a finding of guilt beyond a reasonable doubt, as required by *Jackson*.[6]

A.   **As a Matter of Law Counts 2-15 are Not Valid Charges of Mail Fraud Because the 'Use' of the Mail Was Not for the "Purpose of Executing" the Scheme and did Not Further the Alleged Purpose of Fraud But Risked Exposing the Fraud.[7]**

1.   **The Use of the Mail Must be for the "Purpose of Executing such Scheme"**

As discussed above, mail fraud only exists where use of the U.S. Mails is for the purpose of executing the scheme.  The mailing of the fifteen client status letters (Counts 2-15) had to be an essential part of the alleged scheme to satisfy the elements of mail fraud.[8]  In *Kann*, the Court stated the mail fraud statute does not reach all frauds, "but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."[9]

"The relevant inquiry is whether the mailings were 'sufficiently closely related' to the fraudulent scheme to bring it within the scope of § 1341.[10]  There is simply no relationship (nor a close relationship) between the fifteen client letters to seven clients and the alleged scheme. The letters were simply an effort to keep clients informed, and did not further any purpose of executing the alleged scheme.

---

[6] 443 U.S. at 318.

[7] The Government has agreed to dismiss Count 16, which was the only Count based on the January 7, 2013 client letter.

[8] *United States v. Maze*, 414 U.S. 395 (1974); *Parr v. United States*, 363 U.S. 370, 389-90 (1960) (holding that mailing has to be essential part of the scheme; routine mailings that would have occurred in the absence of the scheme are insufficient); *Kann v. United States*, 323 U.S. 88, 94 (1949) (restricting power of mail fraud statute by holding that mailing was too remote).

[9] *Kann*, 323 U.S. at 94.

[10] *United States v. Shivley*, 927 F.2d 804, 814 (5th Cir. 1991) (quoting *Maze*, 414 U.S. at 399, 94 S. Ct. 645, 648, 38 L. Ed. 2d 603 (1974); *United States v. Toney*, 605 F.2d 200, 205 (5th Cir. 1979)).

The use of the mail needs to be material to the scheme to defraud.[11]  "It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires."[12]

In *United States v. Tencer*, an owner of a chiropractic clinic was convicted of multiple counts of mail fraud after filing fraudulent claims. In *Tencer*, the Fifth Circuit specifically "decline[d] to endorse a broad reading of § 1341's mailing requirement that would relieve the government of the burden of proving that mailings underlying mail fraud counts are related to the fraud being perpetrated."[13]  The Court held that the government's failure to produce any evidence that connected the specific checks upon which the convictions were based to the fraudulent claims was fatal.[14]

In addition, the government, in that case, failed to explain how the "payment of legitimate claims had furthered the scheme to defraud."[15]  Thus, the Court held that a rational

---

[11] *Maze*, 414 U.S. at 401 ("Relying on *Kann*, the Court again found that there was not a sufficient connection between the mailing and the execution of the defendants' scheme, because it was immaterial to the defendants how the oil company went about collecting its payment.").

[12] *Kann* at 94, 65 S. Ct. 148;  see also *United States v. Maze*, 414 U.S. 395, 402, 94 S. Ct. 645, 38 L. Ed. 2d 603 (1974) (defendant's use of stolen credit card for food purchase and hotel stay was complete prior to the use of the mails to communicate the charges or payment and thus the mailings were not sufficiently related to the scheme to confer federal jurisdiction);  *Parr*, 363 U.S. at 393 (school employees' mail fraud convictions were reversed for lack of jurisdiction where unauthorized credit card purchases of gasoline reached fruition at time of receipt of gasoline such that mailed payments by school district to vendors was not in furtherance of the scheme);  *United States v. Evans*, 148 F.3d 477, 482-84 (5th Cir. 1998) (defendant consummated the fraudulent scheme when supervisors approved falsified travel vouchers and before same were mailed to another office for reimbursement such that the mail fraud convictions were reversed);  *United States v. Vontsteen*, 872 F.2d 626, 628-29 (5th Cir. 1989), *cert. denied*, 498 U.S. 1074, 111 S. Ct. 801, 112 L. Ed. 2d 862 (1991) (employee of pipe vendor who fraudulently pocketed profits from sales of pipe while refusing to pay pipe supplier completed the fraud prior to the mailing of invoices by the supplier to his employer.).

[13] 107 F.3d 1120, 1126 (5th Cir. 1997)

[14] *Id.* at 1126–27.

[15] *Id.* at 1126 n.1.

trier of fact could not have found Tencer guilty without evidence that the checks underlying the mail fraud counts contained fraudulent proceeds.[16]

Examples of use of the mail for the "purpose of executing the scheme" are illustrative of the inadequacy of the mail use in this case. For example, in *United States v. Pazos*, 24 F.3d 660, 665 (5th Cir. 1994), an arson insurance fraud case, the use of the mail to execute the scheme was sending letters requesting a $5,000 insurance advance and requesting extensions to file the proof of loss.  The mail actually executed the fraud.  In *United States v. McClelland,* 868 F.2d 704, 706 (5th Cir. 1989), another arson insurance fraud case, the letters were for the purpose of execution of the scheme because the letters: (1) obtained insurance coverage, (2) included an interim report of the loss and (3) sought more information about the loss.   *Id.*   In *Kent*, a fraud scheme involving stolen oil and gas technical data, the letters were "the instructions mailed to real estate brokers to enter particular leases, the payments mailed to those brokers for services, the commissions and royalty assignments mailed indirectly to Kent to obtain the stolen data, and the offer mailed to Union Oil to sell it a part interest.  These mailings were not incidental to the scheme if the materials mailed were integral to the plan's execution."[17]  *Kent* delineated "incidental" use of the mail from mail use that is "integral" to a "plan's execution."[18]  The Fifth Circuit explained further in *Kent*, "It instead requires that **the thing mailed was an integral part of execution of the scheme** so that the use of the mails was in this way 'incident to an essential

---

[16] *Id.* at 1127.
[17] *United States v. Kent,* 608 F.2d 542, 546 (5th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S. Ct. 2153, 64 L. Ed. 2d 788 (1980).
[18] *Id.*; *Henderson v. United States,* 425 F.2d 134, 141 (5th Cir. 1970) ("collateral or incidental" use of the mail is insufficient).

part of the scheme.'"[19]  The Fifth Circuit has reversed convictions where the mail use was not integral to a scheme.[20]

This is simply not a case of mail fraud. The use of the mail to send four clients status reports (on July 30, 2012, October 10, 2012, December 10, 2012, and December 28, 2012) does nothing to execute the alleged fraud; if anything, as shown below, it would uncover any fraud. Moreover, the Government has presented no evidence the letters were in any way misleading or untruthful.[21] The four truthful letters were not fraudulent, nor in any way false, nor did they 'lull' or delay discovery of a fraud.  The letters did nothing to execute the alleged scheme. The late Justice Scalia, in dissent in *Schmuck v. United States*, 489 U.S. 705 (1989), argued that "**it is mail fraud, not mail and fraud, that incurs liability.** This federal statute is not violated by a fraudulent scheme in which, at some point, a mailing happens to occur . . ." *Id.* (emphasis added). The inconsequential mailing of truthful letters here did nothing to execute the alleged scheme, nor was use of the mails a purpose of the alleged scheme.

---

[19] *Kent*, 608 F.2d at 546 (emphasis added) (quoting *Periera v. United States,* 347 U.S. 1, 8, 74 S. Ct. 358, 362, 98 L. Ed. 435 (1954)).

[20] *United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006) ("However, the mail fraud statute does not merely require that a scheme to defraud cause a mailing; it also requires that "the mailing that is caused [be] a part of the execution of the fraud or [be] incident to an essential part of the scheme. 'Although the government produced sufficient evidence to connect Dennis to a scheme to defraud, it falls short of mail fraud.'"); *see United States v. Evans*, 148 F.3d 477, 483 (5th Cir. 1998) (a mailing after the scheme to defraud already "reached fruition" did not constitute mail fraud).

[21] It is not a requirement that the mailing itself be fraudulent, but the mailing itself must be a part of the fraud and be used to execute the fraud, and here sending a truthful letter accomplishes no fraud.

The government has presented no evidence of the fourteen status report letters[22] sent to five individuals, on four dates, advising them of real statute of limitations deadlines, and in compliance with the law, was "for the purpose of executing" the scheme.

The prosecutorial stretch of the rubberband that is the mail fraud statute, does have limits. Acquittal is appropriate.

### 2. The Use of the Mail for the Fourteen Client Letters, Risked Exposing the Alleged Scheme, Not Executing It.

The specific counts of mail fraud charged, are fourteen letters[23] mailed to five individuals: SL, AN, TT, TN, SNTL (also Stacey Le), and TTL. These five individuals were thought to be BP case clients of Mikal Watts. The letters were status reports to clients advising them of the status of the claims for which Mikal Watts served as their lawyer. Sending such letters did not further the purpose of the alleged fraud. Instead, if such individuals were in fact not clients of Mikal Watts, then mailing them letters would only serve to expose and unwind the alleged conspiracy and such use of the mail would not be for the purpose of furthering the scheme.

Mail designed to lull a victim into inaction can be the basis of a mail fraud claim. "Mailings designed to 'lull' the victim into a false sense of security, or to postpone inquiries or complaints, or to make the transaction less suspect are mailings in furtherance of the fraudulent scheme."[24] However, in each of the cited cases the mailing was designed for the purpose of continuing the conspiracy. By contrast the letters at issue here were client status letters. The

---

[22] *See* Exh. N – Mail Fraud Summary.

[23] See Appendix A – Mail Fraud Summary.

[24] *United States v. Shivley*, 927 F.2d 804, 814 (5th Cir. 1991) (citing *United States v. Adkins*, 741 F.2d 744, 750 (5th Cir. 1984), *cert. denied*, 471 U.S. 1053, 105 S. Ct. 2113, 85 L. Ed. 2d 478 (1985); *United States v. Georgalis*, 631 F.2d 1199, 1204 (5th Cir. 1980)).

allegation here is the five individuals who received the client reports were in fact not clients. The result of sending a client report to a non-client only serves to expose the alleged fraud and not further it.[25]

The letters were not fraudulent. The letters were not to trick or deceive a recipient or lull them into inaction. The letters were exactly what a lawyer would send to their clients. Further, allowing the client letters to be the basis of mail fraud is doubly inappropriate here because Watts was required by the State Bar rules to send these letters. Membership in State Bars is mandatory by law and, hence, following the Bar's rules is obligatory. These letters were sent to comply with State laws requiring lawyers to follow bar rules and keep clients informed. The United States Supreme Court has held that mail fraud charges should not stand where the mailing is required by law.[26]   John Cracken testified that Watts sent letters, including those which are the basis of Counts 2-15, to clients at a tremendous expense, all the while knowing they would lose money on this case, in order to comply with their obligations under the law.[27]

The State Bar Rules in Mississippi, Louisiana, Alabama, Florida, and Texas all required Mikal Watts to keep his clients informed, which necessitated use of the mail to send client status reports.  A use of the mails required by State ethics rules, should not be the basis for such a tenuous mail fraud claim, particularly where the mailings served no purpose of the alleged

---

[25] Notably, Stacey Le (sister and roommate of Tuyen Le) was also an employee of Kristy Le and well aware of the WGC role in the BP litigation.

[26] *See Parr v. United States*, 363 U.S. 370, 391 (1960) ("we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys").

[27] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 188:16-22 ("Q: We had the obligation to do this under the law?  A:  Right.  You don't have a choice.  You are trapped.").

scheme. The approaching statute of limitations and presentment deadlines were required to be disclosed. Any lawyer who fails to disclose statute of limitations or maritime presentment deadlines commits per se legal malpractice. The letters in question were compelled by ethical rules and a lawyer's duty to his clients.

The prosecution has presented no evidence that the mailing of fourteen client status reports to five putative clients, in fact furthered the purpose of the alleged fraud. There is no evidence the clients were lulled or in fact took any action based on the fourteen letters. There is no evidence the letters were even read. Similarly, there is no evidence that any of the alleged victims of the fraud, whoever that might be, took any action in response to the letters.  Further, no evidence has been presented that Mikal Watts intended to execute a fraud with these letters advising of statute of limitations deadlines, and the evidence is undisputed that the deadlines and contents of the letters were accurate.

Since the letters were privileged attorney client communications, BP would naturally not know of their existence. Hence there is no evidence of any reliance, action, inaction, or even knowledge of the existence of the fourteen letters by BP. One is only left, as is the jury, with the unanswered question of "What did these fourteen letters do to further the fraud?" Thus the fourteen counts of mail fraud should be dismissed on judgment of acquittal.

### 3.  The Fourteen Letters Did Not Further Fraud

Counts 2-5 are based on July 30, 2012 letters.[28] The July 30, 2012 letters advise on the clients option to  "agree to the settlement process or desire to opt-out of the settlement process." The letter asked the person to provide "your accurate contact information"; "you MUST answer

---

[28] See Exh. G-133.

honestly and fully"; and included the Deepwater Horizon Economic and Property Settement Registration Form (which was drafted by BP). The government has presented no evidence about the registration form. The registration form requires the client's signature, two forms of identification, and is sworn to by the claimant. *Id.* The claim form at page 3 above the signature states "I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this registration Form is true and accurate to the best of my knowledge, and that the supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete...." *Id.* Form at page 3.  A letter asking for the truth does not further fraud.

Counts 8 and 9 are based on a December 10, 2012 letter.[29]  There is no evidence the letter is anything but 100% accurate. The letter advises of the opt-out deadline, the presentment deadline, and the deadline to complete the claim form (which must be signed under oath). A letter truthfully advising a person of the deadlines they must meet if they desire to file a claim does nothing to further fraud. There is no evidence these letters were for the purpose of executing a fraud or these mailings were an integral part of the fraud, or for the purpose of executing the fraud. The crime is mail fraud, not remotely unrelated mail and fraud.

Counts 11 through 15 are based on December 28, 2012 letters.[30] The letter correctly states the statute of limitations deadline, presentment deadline, and deadline to complete the claim form. The letter also encloses a one-page communication entitled: "this is a communication to you from the MDL 2179 Plaintiffs' Steering Committee." Sending a letter forwarding a memo from the Plaintiff Steering Committee concerning the imminent presentment

---

[29] See Exh. G-141, no letter was admitted on Tuan Nguyen on Count 9.
[30] *See* Exh. G-114.

deadline is not fraud. There is no evidence these letters were for the purpose of executing a fraud or these mailings were an integral part of the fraud.

## II.     WIRE FRAUD – COUNTS 17-21

Wire fraud requires intent to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises and transmission of any writings, signs, signals, pictures, or sounds by means of wire communication in interstate commerce for the purpose of executing such scheme.[31]

### A.     The Government has Failed to Introduce Evidence of Wire Fraud

There is insufficiency of evidence on the elements of the five wire fraud counts.

### B.     As a Matter of Law Counts 17-21 are Not Valid Charges of Wire Fraud Because the 'Use' of the Wire Was Not for the "Purpose of Executing" the Scheme and did Not Further the Alleged Fraud.

#### 1.   Wire and Mail Fraud Share the Same Legal Authority.

The Supreme Court has said that because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each.[32]   To prove wire fraud the government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in the scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of the scheme.[33]   "The underlying question is whether the

---

[31] *See* 18 U.S.C. § 1343.

[32] *See Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis…."); *see also United States v. Brumley*, 59 F.3d 517, 520 n. 4 (5th Cir. 1995).

[33] *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 193 (1995).

[use of the wire] somehow contributed to the successful continuation of the scheme—and, if so, whether [it was] so intended by the defendant."[34]

### 2. Acquittal Should be Granted on Counts 18-21 as the Wires Did Not Further the Scheme and Were Not for the "Purpose of Executing" the Scheme.

The undisputed evidence is the November and December 2010 wires totaling $750,000, were sent to obtain phase II packets from clients at the specific request of Ken Feinberg.[35]   Phase I gathering of clients was complete prior to the wire on November 4, 2010. On October 25, 2010 a multi-step client claim documentation proposal was prepared by University of Texas Professor Charlie Silver, for WGC, and submitted by Cracken to Feinberg as a proposed framework for documentation and proof of loss for clients.[36]

This gathering of client packets, at the specific request of Feinberg, is known as Phase II. In this vein,, John Cracken and Ken Feinberg met and formulated a plan for WGC to submit 10 complete client packets with tax returns or other proof of loss and submit them to Feinberg as a template for determining the documentation which would be acceptable.[37]   Cracken testified the November-December 2010 wires totaling $750,000 were sent to the field for the purpose of working on Phase II to collect packets of information on real clients and there was no intent to commit fraud.[38]

---

[34] *United States v. Barraza*, 655 F.3d 375, 383 (5th Cir. 2011) (citations omitted).

[35] Exh. A - Rough Transcript dated July 20, 2016 – Witness Ken Feinberg, 140:1-16.

[36] See D1-71807 - Professor Silver client claim documentation proposal requiring affidavits of clients, tax returns, and other rigorous document vetting for clients claims dated October 25, 2010.

[37] Exh. A - Rough Transcript dated July 20, 2016 – Witness Ken Feinberg, 143:6-16 and Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 20:19-21:15.

[38] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 110:12-18.

The undisputed evidence is on November 15, 2010 John Cracken in writing requested Ken Feinberg to place all WGC claims on hold.[39]  These claims were placed on hold at the GCCF and according to Feinberg were never filed and were locked in a closet and never acted upon (at the request of WGC).[40]

Sending money to do work requested by the claims administrator is not fraud. Wiring money to obtain true and correct information about clients is not fraud or furthering fraud. The wires in counts 18-21 occurred on November 9 and 15, 2010 and December 3 and 6, 2010. The wires were contemporaneous with or after placing all GCCF claims on hold, in order that due diligence requested by the claims administrator could occur.  Acquittal is appropriate as to Watts as there is no evidence these wires furthered fraud and no reasonable juror could conclude his wires were for the "purpose of executing" fraud.

### 3. Acquittal Should be Granted on Count 17 as the Wire Did Not Further the Scheme and Was Not for the "Purpose of Executing" the Scheme.

Count 17 is based on alleged wire fraud from an email of "BP packet group" sent from Texas to Chris Deleon in Gulfport, MS on November 4, 2010.  DeLeon testified he received the email but presented no testimony that the attachment to the email was opened or read or that the email was read by him and resulted in any action or conduct, or that the email in any way furthered the alleged scheme.[41] There is simply no evidence, let alone evidence from which a reasonable jury could conclude beyond a reasonable doubt, that the email was for the "purpose of

---

[39] Exh. A - Rough Transcript dated July 20, 2016 – Witness Ken Feinberg, 146:1-148:20 and Exh. D1-6749.

[40] *Id.*  Similarly, Cracken testified at Mikal Watts specific direction the GCCF claims were placed on hold, and they were locked in a closet and never acted upon. See Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 33:16-34:1.

[41] See Exh. J - Rough Transcript dated August 2, 2016 – Witness Chris Deleon, 25:6-26:21 and D2-072548.

executing" the scheme or that the email furthered the scheme. To paraphrase Justice Scalia, the crime is not "wire and fraud" but wire fraud.[42]  There is no evidence the November 4, 2010 email did anything more to further the scheme than if DeLeon received a spam or junk email the same day.  The two are equally as irrelevant.  Acquittal in Count 17 should be granted.

### C.     ACQUITTAL SHOULD BE GRANTED TO WATTS ON COUNTS 19 & 21.

The undisputed evidence is that the wires sent by Watts made the subject of Counts 18 and 20 were sent for the purpose "to fund the outreach of the client base to collect the documents we needed."[43]  There is no evidence demonstrating Watts was even aware of the wires referenced in Counts 19 and 21, and he cannot be held criminally responsible for any subsequent decision by Greg Warren and others to abscond with those funds in a manner then unknown to Watts.

### D.     ACQUITTAL SHOULD BE GRANTED ON COUNT 21 BECAUSE THERE IS NO EVIDENCE OF THE SAME.

Count 21 alleges wire fraud based on transmission of $748,973 on December 6, 2010. The evidence presented is that a wire of about $250,000 was sent on this date.  The government has presented no proof that $748,973 was wired on December 6, 2010 and as such acquittal should be granted on Count 21.[44]

### III.    IDENTITY THEFT AND AGGRAVATED IDENTITY THEFT – COUNTS 22-25, 27-28, 31-35, 37-49, 53, 55
### IV.

Although the Indictment in this case alleged identity theft in counts 22-73, this Court dismissed counts 50-52, 54, and 56-73 in its Order dated July 18, 2016 (Doc. 297).  The

---

[42]  Justice Scalia, in dissent in *Schmuck v. United States*, 489 U.S. 705 (1989), argued that "**it is mail fraud, not mail and fraud, that incurs liability.** This federal statute is not violated by a fraudulent scheme in which, at some point, a mailing happens to occur ..." Id. (emphasis added).
[43]  Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 104:10-14.

[44]  Indictment does not match the evidence and Count 21 should be dismissed on that grounds. See Exh. G-97.

additional counts of identity theft (Counts 22-25, 27-28, 31-35, 37-49, 53, 55 ) and aggravated identity theft (74-77, 79-89, 91-95) should be likewise dismissed as the Government has produced insufficient evidence to reasonably support a finding of guilt beyond a reasonable doubt, as required by *Jackson*.[45]

Courts describe identity theft and aggravated identity theft as the same offense except aggravated identity theft requires proof of a specific predicate offense required by statute.[46]  The offense of identity theft occurs where a party ***knowingly*** transfers, possesses, or uses, without lawful authority, a means of identification of another person ***with the intent*** to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law . . . ."[47]

The offense of aggravated identity theft occurs where a person ***knowingly*** transfers, possesses, or uses, without lawful authority, a means of identification of another person during and in relation to any felony violation enumerated in 18 U.S.C. § 1028A(c).[48]  The crime of identity theft, like aggravated identity theft, requires the stolen identity be used as part of the underlying crime.  If the alleged underlying crime is completed prior to the use of the identity, then there is no identity theft or aggravated identity theft offense.

      **A.**    **The 3 Identity Theft/20 Aggravated Identity Theft Charges of January 16, 2013, are Not Identity Theft Crimes, As They Occurred 9 to 790 Days AFTER the Predicate Offenses—Not During and in Furtherance of the Alleged Wire or Mail Fraud.**

---

[45] 443 U.S. at 318.

[46] *United States v. Bonilla*, 579 F.3d 1233 (11th Cir. 2009) (aggravated identity theft and identity theft are the same offense for double jeopardy purposes if the predicate offenses are the same).

[47] 18 U.S.C. § 1028(a) (emphasis added).

[48] 18 U.S.C. § 1028A (emphasis added).

For identity misuse to constitute a crime, the misuse according to the statute must occur both during the correct time frame, i.e. during the underlying crime, and it must be a part of the underlying crime. As demonstrated above 45 counts did not occur in the correct timeframe. Further, those alleged misuses of identity are not crimes because they were not a ***part of*** the wire or mail fraud as alleged.

The crimes of identity and aggravated identity theft require the identity use to be part of another specific predicate crime. Identity use two years after wire fraud is not a part of the wire fraud. The alleged identity use on January 16, 2013 was not a part of and did not occur during the wire fraud which as charged occurred on November 4, 9, and 15, 2010 and allegedly on December 3 and 6, 2010. The Indictment charges that there was wire fraud, and then two years later there was an identity used. As charged, there is no identity theft because the alleged identity theft was not a part of the wire fraud.

Similarly, as a matter of law the identity theft, which allegedly occurred on January 16, 2013 cannot be a crime because it was not a part of, and did not occur during, the charged underlying offenses of mail fraud. Counts 2-5 of mail fraud allegedly occurred on July 30, 2012 over five months before the alleged identity theft on January 16, 2013.  Therefore, as a matter of law, this is an invalid charge of identity theft. Count 6 of mail fraud allegedly occurred on October 10, 2012, over four months prior to the alleged identity theft. Counts 7-9 of mail fraud allegedly occurred on December 10, 2012, over one month prior to the alleged identity theft of January 16, 2013, and as such as a matter of law is an invalid charge of identity theft. Counts 10-15 of mail fraud allegedly occurred on December 28, 2012, over 2 weeks prior to the alleged identity theft offenses of January 16, 2013, and as such, as a matter of law, are invalid charges. For the forgoing reason the remaining 3 counts of identity theft and the 22 counts of aggravated

identity theft on January 16, 2013 are invalid and not crimes, because they were not in furtherance of or a material part of the allegedly already completed mail and wire fraud.

The 18 U.S.C. Sec. 1028A, phrase "during and in relation to" also appears in 18 U.S.C. § 1824(c) involving use of a gun in certain crimes.  In that context, the Supreme Court has said the "in relation to" portion of the phrase requires that the firearm "must facilitate or have the potential of facilitating" the predicate offense.[49]  This suggests that the "phrase 'in relation to' in § 1028A . . . means that the 'in relation to' element is met if the identity theft 'facilitates or has the potential of facilitating' that predicate felony."[50]  None of the alleged mail fraud victims are the same people as any of the alleged identity theft victims.  Thus, none of the identity use facilitated any of the mail fraud, and hence was not "in relation to" the underlying offense.

For example, the indictment alleges at Count 2, on July 30, 2012 mail fraud was committed by mailing a client status report to Stacy Le in Ocean Springs, Mississippi,[51] and in Count 82, on January 16, 2013 that the identity of Van Nguyen of Longview, Texas was misused in Chicago, Illinois.[52]  The use of the identification of Van Nguyen, 5 months and 16 days after the use of the mail to Stacy Le on July 30, 2012, did nothing to facilitate the alleged mail fraud. Furthering the underlying alleged fraud is not an identity theft crime, because the underlying fraud is not a federal crime, and identity theft and aggravated identity theft require the identity use be in furtherance of a federal offense. Therefore, the identity use must be in furtherance of the mail fraud itself.  An identity use of Van Nguyen of Longview, Texas does nothing to further the mail fraud of Stacey Le of Ocean Springs, Mississippi, which allegedly happened over five

---

[49] *Smith v. United States*, 508 U.S. 223, 239 (1993).
[50] *United States v. Mobley*, 618 F.3d 539, 548-50 (6th Cir. 2010).
[51] Indictment (Doc. 3), p. 48.
[52] Indictment (Doc. 3), p. 58.

months earlier.   This same analysis applies to every count of identity theft and aggravated identity theft as none of the identity use was in relation to or furtherance of the mail or wire fraud counts.

### 1.   Acquittal Should be Granted on 1028(a)(7) Counts 49, 53, 55

The Indictment here alleges that the defendants "did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person with the **_intent_** to commit, or to aid or abet, any unlawful activity that constitutes a violation of federal law, that is Mail and Wire Fraud . . ."[53]  18 U.S.C. §1028(a)(7) requires the identity's misuse to occur: (1) with the **_intent_** to commit . . . mail or wire fraud; (2) to aid or abet . . . mail or wire fraud; or (3) in connection with unlawful activity which constitutes . . . mail or wire fraud.  Because the wire and mail fraud offenses as alleged occurred months or even years prior to the alleged misuse of the identity, none of these 3 requirements of 1028(a) have been, or even conceivably could be, proven.

The January 16, 2013 identity use could not occur with: (1) the "intent to commit" mail fraud on July 30, 2012; (2) the "intent to aid and abet" mail fraud on July 30, 2012; or (3) "in connection with" mail fraud on July 30, 2012, because the identity was allegedly used six months after the mail fraud allegedly occurred. All three counts of identity theft on January 16, 2013 (counts 49, 53, and 55) must be dismissed on judgment of acquittal because they occurred 9 days to 790 days after any alleged wire and mail fraud.

### 2.   Acquittal Should be Granted on All 1028A Counts 74-77, 79-89, 91-95

In order to violate 1028A(a)(1), the aggravated identity theft must have occurred "**during and in relation to** any felony violation enumerated in subsection (c)," which provides a laundry

---

[53] Indictment (Doc. 3), p. 52-53, ¶2 (emphasis added).

list of predicate federal offenses. 18 U.S.C. Sec. 1028A(a)(1)(emphasis added). All 22, 1028A counts are based on identity use long after the mail and wire fraud allegedly occurred, and thus cannot be an identity theft offense as a matter of law from a temporal perspective.

There is little case law interpreting the phrase "during and in relation to" in the context of 18 U.S.C. § 1028A(a)(1). However, based on the government's concession, the Fifth Circuit has reversed a conviction under this provision. In *United States v. Ekwuruke*, 372 Fed.Appx. 521 (5th Cir. April 7, 2010) (unpublished), the defendant was a temporary employee of Bank of America, which had contracted to receive and process tax payments on behalf of the IRS. The defendant stole checks during his employment and was charged with theft of bank funds and theft of government funds. He was also charged with aggravated identity theft – the predicate offense being the theft of bank funds – in connection with his altering and depositing one of the stolen checks. Because the check deposit occurred after his employment with Bank of America had ended, the government conceded on appeal that the identity theft was not "during and in relation to" the theft of bank funds. Id.

For example, the 20 counts (74-77, 79-89, 91-95 ) of January 16, 2013 aggravated identity use, occurred 2 years and 2 months after wire fraud Count 19, which allegedly occurred on November 9, 2010, and thus the aggravated identity use was not "during and in relation to" the wire fraud which happened over 2 years earlier. Acquittal should be granted on Counts 74-77, 79-89, 91-95  because the identity use occurred 19 days to 790 days after the various acts alleged of mail and wire fraud. *compare*, Counts 2-15, 17-21 and 74-77, 79-89, 91-95 .

**B.      Additional Counts of Identity Theft Are Invalid and Judgment of Acquittal Should Be Granted.**

Counts 17 and 18 of wire fraud alleged on November 4 and 9, 2010[54] cannot serve as a basis for any identity theft charge in counts 22-25, 27-28, 31-35, 37-49, 53, 55 or aggravated identity theft in counts 74-95, as they pre-date the identity use for all such counts by ten days to over two years, and were not part of the alleged offense.  Since as charged counts 17 and 18 occurred prior to the use of the identity, the identity and aggravated identity theft was not part of and did not occur during the charged offense.

Similarly, Counts 41 through 49 of identity theft allegedly occurred on January 6, 2011 to as recent as January 16, 2013. These counts as charged are based on the charged wire fraud counts 17-21, which were all occurred by December 6, 2010 at the latest. As a matter of law counts 41 through 49 of identity theft cannot be based on the counts 17-21 of wire fraud because the alleged wire fraud pre-dates the use of the identity. As noted above counts 53, 55, and 74-77, 79-89, 91-95  cannot be based on wire fraud charged in counts 17-21, for the same reason.

**C.      Counts** 22-25, 27-28, 31-35, 37-49, 53, 55 **are Not Valid Charges of Identity Theft and Counts 74-95 Are Not Valid Charges of Aggravated Identity Theft Because the Person to Whom the Mail Fraud is Alleged is Not the Same Person as the Alleged Identity Theft Victim.**

Identity theft must be part of the same underlying federal crime. This section of the motion focuses on mail fraud, but the same analysis applies to the wire fraud counts. In this case, the additional federal crimes charged are "mail and wire fraud".[55]  The specific counts of mail fraud charged, are fourteen letters mailed to five individuals: SL, AN, TT, TN, SNTL and TTL The identity theft and aggravated identity theft crimes are allegedly based on the theft of the

---

[54] Indictment (Doc. 3), p. 52.
[55] Indictment (Doc. 3), p. 53.

identity of 27 different individuals (not SL, AN, TT, TN, SNTL and TTL).   Since the individuals' identities in the alleged identity theft are different than the individuals who received alleged mail fraud, there is no crime of identity theft.  The prosecution has failed to show any relation between the persons receiving mail and the persons whose identities were used.

As an example, Mikal Watts allegedly committed mail fraud by causing a client status letter to be mailed to Stacy Le of Ocean Springs, Mississippi on July 30, 2012. Five months and 16 days later, on January 16, 2013, Maria Vu's identity was allegedly misused. Maria Vu of Longview, Texas lives over 500 miles away from Stacy Le of Ocean Springs, Mississippi. Providing written notice to Stacey Le that she has a court deadline to provide claim information, has no relation to the use of Maria Vu's identity to 'present' the claim of Maria Vu in Chicago, Illinois almost six months later. Acquittal as to this Count is appropriate. The prosecution has presented no evidence to show the use of the identity of each of the 27 specific individuals (who are alleged identity or aggravated identity theft victims) was in any way a part of the use of the mail to five totally different people. None of the 27 identities allegedly used were of any of the seven persons to whom mail fraud letters were allegedly sent, and the government has presented no evidence linking the mail use for one person to an identity use of a totally different person.[56]

18 U.S.C. Sec. 1028(a)(7), requires "a violation of federal law" and use of the means of identification "that constitutes a violation of federal law" in one of 3 ways, with: (1) an "intent to commit" violation of federal law (mail fraud); (2) "to aid or abet" the mail fraud; or (3)  "in connection with" activity that "constitutes" mail fraud. The prosecution must prove that on each occasion an identity was used, it was done with the intent to commit mail fraud (directly or by

---

[56] For example, there is no evidence linking the use of the mail to send a statute of limitations warning letter to Anthony Nguyen on July 30, 2012 (count 4) to the use of Maria Vu's identity to preserve any claim she might have on January 16, 2013 (count 80).

aiding and abetting) or a part of the conduct "that constitutes" mail fraud. Because the use of the mail was to completely different people than the identities allegedly misused, and because it was at a later point in time, there is no crime of identity theft (or for that matter aggravated identity theft).

For example, count 53 alleges on January 16, 2013 the name, date of birth, and social security number of Mary Quave of Vancleave, Mississippi, was misused and count 2 alleges on July 30, 2012 Mikal Watts mailed a letter to Stacy Le in Ocean Springs, Mississippi as a count of mail fraud. To establish identity theft the government must prove one of three things: (1) that when the name, date of birth, and social security number of Mary Quave was used on January 16, 2013 that Mikal Watts acted with "intent to commit" mail fraud on July 30, 2012 via a letter to another person (Stacy Le); (2) that when Mary Quave's identity was used on January 16, 2013 it was to aid and abet mail fraud on July 30, 2012 via a letter to Stacy Le; or (3) that the use of Mary Quave's identity on January 16, 2013 was "in connection with unlawful activity that constitutes" mail fraud on July 30, 2012 via a letter to a totally different person, Stacy Le. It is simply impossible on January 16, 2013 to possess the intent to commit mail fraud six months earlier, or to aid and abet, or to 'use' in connection with activity that constitutes mail fraud, which occurred six months earlier in time. Further none of these elements can be met where the identity is of Mary Quave, and has no relation to mail fraud of Stacy Le, a totally different person.

The foregoing analysis applies to every count of identity theft and aggravated identity theft, either because the use of identity occurred after the underlying crime and not as a part of it, or because the identity belonged to a totally different victim than the alleged victim of the underlying crime. Further, the Government has presented no evidence to show a client status

report mailed to one person bears any relation to a presentment filed for a totally different person. The entire purpose of identity theft crimes is to make misuse of an identity as part of another specified crime. Where the underlying crime has already occurred or involves totally different persons, there can be no crime from a subsequent identity use of someone else.

Similarly, even the party to whom the claims were being preserved differs in many counts. For example, counts 22-40 involve a November 18, 2010 providing of information to the GCCF. However, counts 49-95 involve 'presentment' of claims to BP. A preservation of rights 'notice' letter for presentment to BP is unrelated to a client status letter about the GCCF.

Each of the three parenthetical elements of 1028(a)(7) identified above requires the "use" of the identity, which means the identity must be a part of the underlying offense. The three elements all require the underlying offense to occur while the identification is being misused since the statute requires (1) identity use with the "intent to commit"; (2) identity use "to aid and abet" the crime; or (3) identity use "in connection with unlawful activity which constitutes" the crime. Identity misuse cannot occur after the fact. Aiding and abetting cannot occur after the fact[57]; instead, it must occur during the commission of a crime because it requires specific intent to facilitate the crime and willfully taking part in the crime.[58]

There is insufficient evidence in relation to any of the 27 alleged identity or aggravated identity theft victims to show it was part of the commission of mail fraud. Acquittal is appropriate.

---

[57] 18 U.S.C. § 2; *United States v. Chavez*, 119 F.3d 342 (5th Cir. 1997).
[58] 18 U.S.C. § 2; *United States v. Landerman*, 109 F.3d 1053, 1068 n.22 (5th Cir. 1997)

**D.    Counts** 22-25, 27-28, 31-35, 37-49, 53, 55 **and Counts** 74-77, 79-89, 91-95 **Are Not Valid Charges Because the Wire Fraud as Alleged in Counts 18-21 did not Transmit Money Connected in Any Way to the Identity or Identity Use of the 27 Alleged Identity Theft Victims.**

Similarly, counts 18-21 of wire fraud cannot support a charge of identity theft. These counts were wires of funds. The prosecution has shown no connection between this money or wiring this money and the 23 individuals. Their identities were in no way connected to the funds wired or the transmission of the funds. The 23 identities were not used in any fashion "that constitutes" wire fraud. The prosecution has presented no evidence to connect the 4 wires in Counts 18-21 with the 23 specific individuals who are the alleged identity and aggravated identity theft counts. Acquittal is appropriate.

Counts 18-21 charge that four wire transfers of funds constitute wire fraud to allegedly sign up invalid clients. However, the prosecution has failed to demonstrate any of these specific funds were used to obtain the identity of the 23 identified alleged identity theft victims. The prosecution has failed to demonstrate any nexus between these funds and either the obtaining or misuse of the identity of alleged 23 victims. The government has shown there were multiple other wire transfers of funds (which other wires are not charged and if charged would violate the statute of limitations for wire fraud), and have failed to prove which wires paid for the acquisition of the 23 specific identities. There is insufficient evidence to show the 23 victims' information was obtained in relation to the specific wires alleged. Further, IP Development mixed the unindicted funds (barred by statute of limitations wired funds) with the indicted transfers.  Money is fungible. The government failed to present evidence to trace the indicted wired funds and differentiate it from the unindicted transfers. There is no nexus.

Similarly, the government has failed to show any relation between the November 4, 2010 email (wire) and the use of 23 persons' identities between two weeks and over two years thereafter.

> **E.    Counts 22-49, 53, 55 and Counts** 74-77, 79-89, 91-95   **Are Not Valid Charges Because the Wire Fraud as Alleged in Count 17 did not Transmit an Email with a Sufficient Connection to Further Fraud as to the 23 Alleged Identity Theft Victims.**

Count 17 is an alleged wire fraud from an email of "BP packet group".[59]  It is based on a November 4, 2010 email from David Watts to Chris DeLeon,[60] which email the government failed to produce any evidence it was read or the attachment opened or that it had any relation to the identity use of 23 specific individuals.[61]  The unread attachment contained maps of five coastal states and an index of phase II packets being sent to the field to fulfill Feinberg's request and perform due diligence.[62]

> **F.    Identity and Aggravated Identity Theft Require a Real and Specific Person's Identification.**

Both 18 U.S.C. § 1028A(a)(1) and § 1028(a)(7) only reach the use of a means of identification that belongs to a real person.[63]  18 U.S.C. § 1028(d)(7) defines the term ''means of identification'' to mean any name or number that may be used, alone or in conjunction with any other information, to identify a "specific individual."

---

[59] Indictment (Doc. 3), p. 52.

[60] See Exh. J - Rough Transcript dated August 2, 2016 – Witness Chris Deleon, 25:6-26:21 and D2-072548.

[61] *Id.*

[62] See Exh. O. D2-072596 and D2-072595, (6 maps and one page example of index)

[63] *See, e.g., United States v. Jimenez*, 507 F.3d 13, 20 (1st Cir. 2007) ("A false identity built on the bedrock foundation of real means of identification — that is to say, actual Social Security numbers, real names and dates of birth — provides better cover for the wrongdoer than would one based on wholly fabricated identities . . . .").

In *United States v. Mitchell*, the court held that the statutory definition "allows for an identifier, taken alone or together with other information, to qualify as a means of identification so long as the sum total of information identifies a specific individual."[64] A name alone is insufficient.[65]

*Mitchell* involved a counterfeit check scheme, wherein the defendant bought merchandise with counterfeit checks, then later returned the merchandise for cash. When paying by check, the defendant presented a false Georgia driver's license that he created in the name of "Marcus Jackson." The driver's license also contained an address and a date of birth. In fact, the Georgia department of motor vehicles had issued licenses to two individuals named Marcus Jackson, one of whom – Marcus Deyone Jackson – lived in the same town (East Point, GA) and had the same year of birth as appeared on the false license. The government claimed that this information was sufficient to identify a specific individual (Marcus Deyone Jackson from East Point, GA). The Fourth Circuit disagreed.

The Court emphasized a distinction between "unique identifiers," such as a government-issued driver's license number (or social security number, A- number, and the like) and "non-unique" identifiers, such as first and last name, city of residence, and year of birth. A unique identifier "identifies a 'specific individual for purposes of § 1028A(a)(1).'"[66] Non-unique identifiers, on the other hand, may be too general to identify a specific person. Such was the

---

[64] 518 F.3d 230 (4th Cir. 2008).

[65] *United States v. Mitchell*, 518 F.3d 230, 234 (4th Cir. 2008) ("A name alone, for example, would likely not be sufficiently unique to identify a specific individual because many persons have the same name")

[66] *Id.* (The number on the false driver's license in this case was wholly fictional). *See also United States v. Melendrez*, 389 F.3d 829, 830 (9th Cir. 2004) (real Social Security numbers used alone or in conjunction with other information constitute a means of identification because they can be used to uniquely identify specific persons).

case in *Mitchell*: (1) "Marcus Jackson" was not an exact match with "Marcus Deyone Jackson," the individual from East Point; (2) though Marcus Deyone Jackson lived in East Point, he did not live at the address given on the false license; and (3) though Marcus Deyone Jackson had the same year of birth as that on the false license, he had a different month and date of birth.

### G.   ALL ELEMENTS OF IDENTITY THEFT REQUIRE *KNOWING* MENS REA.

The Supreme Court in *Flores-Figueroa v. United States* made clear that the knowledge element colors each of the other elements.[67]   The prosecution has failed to present sufficient evidence that Watts acted knowingly with respect to every element of identity and aggravated identity theft.

### H.   SPECFIC IDENTITY AND AGGRAVATED IDENTITY THEFT CLAIMS WHICH FAIL AS A MATTER OF LAW

1. **Counts** 74-77, 79-89, 91-95

Counts 74-77, 79-89, 91-95 all relate to identity use in the filing of presentment forms, and all except count 93 claim an individual victim's name was misused. However, the presentment forms for counts 74-77, 79-89, 91-95 did not use the alleged victims' actual names. These counts, at a minimum, reversed the alleged victims' first and last names as used in the presentment forms.

1.   Counts 37 and 91

Counts 37 and 91 for Cindy Tran use the social security number of 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. This is not her number and is, frankly, not even a valid social security number.  Count 91 is based on the presentment form, which used the wrong social and used the name of Tran Cindy. Thus, both the

---

[67] *Flores-Figueroa v. United States*, 556 U.S 646, 649 (2009) ("As a matter of ordinary English grammar, it seems natural to read the statute's word 'knowingly' as applying to all the subsequently listed elements of the crime.").

name and social do not match.

### 2. Count 93

In the case of Mary Sutton Luckett (count 93), the name used on the presentment form was Luc Mary rather than Mary Sutton Luckett.[68] Luc Mary is not an actual identity and presentment of a claim for Luc Mary cannot be the basis for aggravated identity theft.

## V. CONSPIRACY – COUNT 1

Judgment of acquittal should be granted on the conspiracy count. Conspiracy exists where two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.[69]

### A. The Government has Produced No Evidence of Watts' Participation in the Alleged Conspiracy

Count 1 of the Indictment in this case alleges that all seven defendants "did knowing[ly] and willfully conspire with each other" to commit mail fraud, wire fraud, identity theft, and aggravated identity theft.[70] For a jury to convict a defendant of conspiracy to commit these crimes, the Government must prove beyond a reasonable doubt that: (1) the defendant and at least one other person made an agreement to commit the crime(s) . . . ; (2) the defendant "knew the unlawful purpose of the agreement and joined in it willfully, that is, with the **intent** to further the unlawful purpose;" and (3) one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment in order to

---

[68] Exh. H - Rough Transcript dated July 29, 2016 – Witness Mary Luckett, 148:10-14.
[69] *See* 18 U.S.C. § 371.
[70] Indictment (Doc. 3), p. 14 (emphasis added).

accomplish the purpose of the conspiracy.[71]  The Government must prove agreement on one of the objectives charged in the indictment and "that each defendant knowingly participated in a scheme to achieve this particular goal."[72]

Simply stated, the Government has introduced not one shred of evidence showing Watts agreed to commit any crime, that he knew of any unlawful purpose, that he willingly joined in any agreement to commit a crime, or that he had the intent to further any unlawful purpose in a conspiracy with the other six defendants in this case, as charged in the Indictment.  There is no evidence in this record that Watts even knew of the existence Ryan Willis,  Denspri, LLC, or IRB Search at the time the identifiers were beinn obtained.  For instance, Ryan Willis testified that in relation to Denspri and/or IRB searches he was hired by Kristy Le to perform, the only person he sent results to was Kristy Le—never to Watts Law Firm.[73]

Taken a step further, Mr. Willis's trial testimony and documents referenced therein established that (1) Kristy Le hired Willis to obtain social security numbers for what she represented to Willis to be valid, existing clients;[74] (2) Denspri's reports provided to Kristy Le as a result of the requested searches included information indicating whether each particular search concerned a deceased individual;[75] and (3) Between the Denspri reports arriving in Kristy Le's

---

[71] *See United States v. Moss*, Criminal Action No. 09-123, 2011 WL 2118940 at *4 (E.D. La. May 24, 2011) (citing *United States v. Hernandez-Vera*, No. 09-40821, 2010 WL 5299886 (5th Cir. Dec. 23, 2010)).

[72] *Moss*, 2011 WL 2118940 at *4 (quoting *United States v. Berger*, 224 F.3d 107, 113 (2d Cir. 2000)).

[73] Exh. J - Rough Transcript dated August 2, 2016 – Witness Ryan Willis, 154:11-20.

[74] Exh. J - Rough Transcript dated August 2, 2016 – Witness Ryan Willis, 126:11-20.

[75] Exh. J - Rough Transcript dated August 2, 2016 – Witness Ryan Willis, 158:16-25.

hands and the time Kristy Le emailed the reports to Eloy Guerra, any deceased notifications or markings were deleted from the spreadsheet.[76]

### B. The Government's Phone Book Theory Completely Undermines the Conspiracy Alleged in Count 1

Several witnesses have addressed the possibility that the initial client data contained in some of the client questionnaires sent to Watts Guerra Craft was information merely copied from phone books.[77] However, any conspiracy aimed at creating clients by lifting names, addresses, and phone numbers from a phone book cannot possibly include Watts. The evidence shows that: (1) Watts would not have paid over $10 million for someone to "take names out of a phone book"[78] and (2) Watts could not collect any money for claims of individuals who could not present two forms of identification (i.e. clients created merely by lifting names, addresses, and phone numbers from phone books).[79] Paying an inordinate amount of money for false claims that are completely incapable of producing recovery for the client or Watts is completely

---

[76] Exh. J - Rough Transcript dated August 2, 2016 – Witness Ryan Willis, 161:17-22.

[77] Exh. B - Rough Transcript dated July 21, 2016 - Witness WIlliam McLelland, 140:1 - 140:7 and Witness James Hutto, 157:25 - 158:1; Exh. C - Rough Transcript dated July 22, 2016 - Witness Hue Nguyen, 81:17 - 81:18; Exh. D - Rough Transcript dated July 25, 2016 - Witness Hung Do, 67:6 - 67:8 and Witness Tan Nguyen, 76:24 - 77:1; Exh. E - Rough Transcript dated July 26, 2016 - Witness Cindy Tran, 6:20 - 6:21, Witness Phuoc Nguyen, 34:16 - 34:17, Witness Harold McLelland, 66:16 - 66:19, Witness Kiet Nguyen, 71:10 - 71:11, Witness Mary Quave, 128:16 - 128:21, and Witness Richard Moore, 143:22 - 143:24; Exh. G - Rough Transcript dated July 28, 2016 - Witness Lily Ho, 142:8 - 142:9; Exh. H - Rough Transcript dated July 29, 2016 - Witness Chi Nguyen, 68:17 - 68:18, Witness Donald Luc, 90:14 - 90:15, Witness Donald Luc, 98:16 - 98:17, Witness Gwendolyn Luc, 113:8 - 113:9, and Witness Mary Luckett, 152:18 - 155:2; Exh. I - Rough Transcript dated August 1, 2016 - Witness Luke Skidmore, 8:1 - 8:21 ; 9:14 - 9:24 ; 13:17 - 13:24 and Witness Hang Hoang, 82:13 - 82:14; **Exh. J** - Rough Transcript dated August 2, 2016 - Witness Diana Nguyen, 33:13 - 33:14 ; 36:16 - 36:18 and Witness Dung Vu, 119:16 - 119:23.

[78] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 88:21-89:2.

[79] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 88:7-11; Exh. L - Rough Transcript dated August 4, 2016 – Witness Paul Leftwich, 21:10-13; Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, 58:13-15.

unbelievable and no reasonable jury could find Mikal Watts entered into a conspiracy involving the Government's phone book theory.[80]

### C.   Even If Multiple Conspiracies Existed, Watts Did Not Join Willfully or With Intent to Further an Unlawful Purpose

The Indictment herein alleges a single conspiracy.  However, the Fifth Circuit has held that where the evidence points to multiple conspiracies rather than a single conspiracy charged in the indictment, this variance between the indictment and the evidence affects the defendant's substantial rights where the Government does not establish the defendant's involvement in at least one of the proved conspiracies.[81]  Not only has the Government failed to establish Watts's involvement in any possible conspiracy, but testimony in this case directly proves the exact opposite—rather than intent to further an unlawful purpose, Watts's intent was to provide as much transparency as possible concerning issues of the validity of Watts's client base once those issues came to his attention.  For instance, John Cracken testified that Watts instructed him to request that the GCCF place the Watts clients' emergency claims on hold, Cracken did so, and those claims remain on hold to this date.[82]

The only evidence in this record is that Watts disclosed to the GGCF, BP, the Court and the Settlement Administrator the infirmities he learned of with respect to his BP docket.  His actions do not demonstrate that he joined willfully a conspiracy; rather, that he did not do so.  His repeated efforts to disclose are the exact opposite of the types of willful actions necessary to

---

[80] Another of the overt acts listed in the indictment raises the issue of the destruction of documents. The government placed no evidence into the record that the destruction of any records was out of the ordinary course of business. WGC like this honorable Court, runs a paperless filing system. It is not wrongful under ordinary circumstances to comply with a valid document retention policy. *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

[81] *See United States v. Mitchell*, 484 F.3d 762, 769-70 (5th Cir. 2007) (citing *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999)).

[82] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 105:2-7.

join a conspiracy for an unlawful purpose required for conviction.  As such, acquittal should be ordered in Count 1 as to Watts.

## VI.  ACQUITTAL FOR LACK OF PROOF OF SPECIFIC INTENT AND ACTING KNOWINGLY IS PROPER ON ALL COUNTS

All 66 remaining counts in the Indictment require proof of specific intent to commit fraud.  The Government has failed to present evidence from which a reasonable jury could conclude Mikal Watts had the specific intent to commit any type of fraud.  The Government has called very few witnesses who even spoke with Mikal Watts.  John Cracken testified Mikal Watts acted in good faith and he saw no evidence of any fraud.[83]  Joe Navarro testified he saw only evidence of appropriate behavior by Mikal Wattts.[84]  Chris DeLeon testified he saw nothing but appropriate behavior by Mikal Watts.[85]  Kenneth Feinberg testified he knew Mikal Watts was not a "fraudster", nor was the team of experts he and Cracken assembled to help with the claims process.[86]  Kendra Saxvik testified Mikal Watts acted to help real clients and in an appropriate way.[87]  Kayleigh Stone testified she thought the presentment forms were filed for clients without contracts, but later admitted the client contracts were all filed as part of the presentment so any client who actually was missing a contract was still fully disclosed.[88]  Stone also testified (as did the prior witness, Paul Leftwich, and the following witness, Roma

---

[83] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 164:10-13; 172:1-4; 191:2-8; 199:23-200:4.

[84] Exh. K - Rough Transcript dated August 3, 2016 – Witness Joe Navarro, 168:18-169:4.

[85] Exh. I - Rough Transcript dated August 1, 2016 – Witness Chris Deleon, 195:9-17; 207:1-7; 225:23-226:1; 226:20-23.

[86] Exh. A - Rough Transcript dated July 20, 2016 – Witness Kenneth Feinberg, 112:3-11; 117:13-118:2; 118:7-15; 148:14-20; 149:6-11; 152:17-153:1.

[87] Exh. K - Rough Transcript dated August 3, 2016 – Witness Kendra Saxvik, 201:12-203:17.

[88] Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, 158:2-14.

Petkauskas) that missing documents could be provided after presentment was filed.[89]  A non-attorney's now-admittedly mistaken view[90] of what is appropriate or not in a maritime presentment process is not material evidence as to the state of mind of attorney Mikal Watts. Watts filed all documents in his possession as advised by the PSC, and as advised by Jim McCormick, the former Texas State Bar ethics compliance officer who was hired to advise Watts and Cracken on these legal issues.[91]

The Government witnesses also testified January 20, 2013 was the presentment deadline and failure to meet this deadline would bar all claims.[92]  The undisputed evidence shows that no claim could be processed for payment without proof of two forms of valid identification and lost income (i.e. tax returns) from the claimant[93] and Watts could not recover for any client who was not real and was not his client. Watts, at all relevant times, knew that no recovery could be made for false clients.[94]  Fundamentally, there is no evidence from which a reasonable juror could conclude Mikal Watts possessed a specific intent to commit fraud.[95] Acquittal is appropriate on all 66 remaining counts.

---

[89] Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, 168:22-169:8; Witness Paul Leftwich, 33:16-34:9, and Witness Roma Petkauskas, 228:18-229:14.

[90] Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, 110:19-111:1;

[91] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 170:6-171:3

[92] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 189:2-13; 189:22-190:13.

[93] Exh. F - Rough Transcript dated July 27, 2016 – Witness John Cracken, 88:7-11; Exh. L - Rough Transcript dated August 4, 2016 – Witness Paul Leftwich, 21:10-13; Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, 58:13-15; 182:18-20.

[94] See Exh. F – Rough Transcript dated July 27, 2016 – Witness John Cracken, 140:13-141:2.

[95] Exh. L - Rough Transcript dated August 4, 2016 – Witness Kayleigh Stone, p. 103:1-11; 115:9-14; 116:13-19; 161:1-7; 186:4-6; 186:10-16; 188:9-15;

## VII.  DOUBLE JEOPARDY BARS DUPLICATIVE COUNTS

### A.  Counts of Mail Fraud are Duplicative and Barred by Double Jeopardy.

"Specifically, the double jeopardy clause protects . . . 'against multiple punishments for the same offense.'" *United States v. Bonilla*, 579 F.3d 1233, 1239 (11th Cir. 2009) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977).

Counts 2, 3, and 4 allege the same July 30, 2012 letter sent from the same person, Mikal Watts, to the same person, "SL".  These three counts of mail fraud are de facto identical conduct and as such would constitute multiple punishment for the same conduct. This is barred by double jeopardy. Even if mailing the same letter three times occurred and the prosecution contends it is separate conduct, there is no evidence each additional mailing actually furthered any alleged scheme. Admittedly, separate acts of conduct, resulting in separate injuries, could be separate crimes and therefore not barred by double jeopardy.  However, there is no evidence this letter was actually read or resulted in any change in conduct by Stacey Le.[96]  Further, there is no evidence that three mailings of the same letter, on the same day, to the same person somehow separately furthered the alleged scheme, nor that each of the identical letters was for the purpose of executing the scheme. There is insufficient evidence to allow multiple convictions for the same de facto conduct.  Absent a judgment of acquittal of all mail fraud counts under the Indictment, two of these three counts (Counts 2, 3, and 4), at a minimum, should be dismissed under double jeopardy.

---

[96] See Exh. J – Rough Transcript dated August 2, 2016 – Witness Stacey Le, 55:1-5. Stacey Le testified she did not open or read the letters.  Id. at 72:22-73:10; 74:12-16. The government put on evidence that Tuyen Le's minor daughter opened the mail, but the government put forth no evidence Tuyen Le read or acted upon the letters. See Exh. J – Rough Transcript dated August 2, 2016 – Witness Tuyen Le at 104:6-105:7.

Similarly, Count 7 is identical to Count 8. Count 11 is identical to Count 12. Count 10 is identical to Count 14, and Count 15 only differs by the doubling of Tuyen Le's first name as a middle name "Tuyen Tuyen Le."  Again, mailing identical letters on the same day from the same person, to the same person at the same address, either is identical conduct, which can only be one crime under double jeopardy, or is indistinguishable conduct, which does nothing to further the alleged conspiracy that a single letter would not accomplish. Under either theory acquittal is appropriate.

### B.      Counts of Wire Fraud are Duplicative and Barred by Double Jeopardy

Count 18 is a wire of $500,000 from Texas to Jackson, Mississippi, and Count 19 is a wire of $498,988 of those same dollars from Jackson to Louisiana. Assuming the money once it reaches its destination is used to further fraud, any intermediate stops the money makes or intermediate transfers of the money are irrelevant. All wire transfers are cleared through the federal reserve, so why wouldn't every wire actually be multiple wires?

The transfer of the same funds to multiple places, in this setting, is barred by double jeopardy. Here the transfer is de facto a single act, namely, transmitting funds from the source to the end user. Punishing the single act of transmission of funds, as multiple crimes, would constitute multiple punishments for a single crime, and violate double jeopardy.[97]

Counts 20 and 21 are similarly duplicative. Count 20 is a December 3, 2010 wire transfer from Texas to Jackson, MS of $250,000 and Count 21 is a wire of the same funds on December

---

[97]   In the alternative, the intermediate transfer of funds to Anders Ferrington, in Jackson accomplished nothing to further the alleged conspiracy or fraud.  No evidence has been presented that the transmission to Jackson did anything to further or accomplish a conspiracy. The intermediate transfer to Jackson is not wire fraud.

6, 2010 from Jackson to Louisiana of $748,973.[98] Wiring the funds in intermediate steps accomplished no furthering of the alleged fraud, and to break a de facto single transmission from point A to point B into multiple crimes constitutes double jeopardy.

## CONCLUSION

Based upon the foregoing, Defendant Mikal C. Watts requests that the Court enter an order granting him a judgment of acquittal regarding all remaining counts of the Indictment in this case and all other relief to which he is justly entitled.

Respectfully submitted this 16th day of August, 2016.

By:     *s/Mikal C. Watts*
        Mikal C. Watts
        Texas State Bar #20981820
        WATTS GUERRA LLP
        4 Dominion Drive, Bldg. 3, Ste. 100
        San Antonio, TX 78257
        Telephone: 210/447-0500
        Facsimile: 210/447-0501
        Email: mcwatts@wattsguerra.com

        ATTORNEY FOR DEFENDANT
        MIKAL C. WATTS

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2016, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

        *s/Mikal C. Watts*
        Mikal C. Watts

---

[98] The evidence presented is that the wire was of $248,973, and as such the Indictment does not match the evidence and Count 21 should be dismissed on that ground. See Exh. B – Rough Transcript dated July 21, 2016 – Witness Anders Ferrington, 17:20-22.